## Downwyn Farms v. Ohio Ins. Guaranty
### Case No. 89CA004593
### Lorain County, (9th)
### Decided January 31, 1990
[Cite as 1 AOA 371]

*Daniel J. Sammon and John R. Hlavka, Attorneys at Law, 100 Erieview, Erieview Plaza, #2850, Cleveland, OH 44114 for Plaintiff.*

*Matthew J. Hatchadorian, Attorney at Law, 2100 One Cleveland Center, 1375 E. Ninth St., Cleveland, OH 44114 for Defendant.*

REECE, J.

Downwyn Farms (Downwyn) appeals from the decision of the trial court which granted judgment in Downwyn's favor following trial to the court, but limited Downwyn's claim and damage award.

## THE FACTS

In April, 1984, a standardbred mare, Candy D. Travel, owned by Jerome Lichtenstiger (Lichtenstiger), was delivered to Downwyn for care during foaling.

On April 23, 1984, Candy D. Travel gave birth to a colt, which is a male foal, as was initially noted in Downwyn's records. At a later time, farm personnel recognized that the foal with Candy D. Travel was a filly, or female. Believing that the initial farm records were in error, farm personnel altered those records to show foaling of a filly. When Lichtenstiger returned to Downwyn on June 23, 1984, to take the mare and foal home, he refused the filly, informing Downwyn that on earlier visits he had noted that the foal was a colt. Downwyn agreed to keep both Candy D. Travel and the filly free of charge while the claim was investigated.

Downwyn drew blood samples from the mare and the filly, which were sent to the Serology Laboratory at the School of Veterinary Medicine, University of California at Davis (Davis). The test results, released on September 4, 1984, demonstrated that the filly could not genetically be the offspring of Candy D. Travel.

Downwyn decided to systematically sample each of the other horses and foals which were at the farm during the period of Candy's stay in order to identify and locate Lichtenstiger's foal. Downwyn personnel logged over twenty three hundred miles in this effort. On December 17, 1984, his foal not having yet been located, Lichtenstiger filed a complaint against Downwyn in the Lorain County Court of Common Pleas, alleging negligence, conversion and breach of contract.

During this time period, Downwyn held two policies of insurance issued by the Transit Casualty Company of St. Louis, Missouri (Transit): one general liability policy, and one legal liability policy specifically covering horses in the care, custody and control of Downwyn. These policies were apparently purchased through the Sponseller-Peterson agency of Wellington, Ohio, by way of the Pease-Kerr Agency, Inc. of Painesville, Ohio, through the policy producer, Rhulen Agency, Inc. of Monticello, New York.

In March, 1985, Downwyn sent copies of the Lichtenstiger complaint to Sponseller-Peterson, which delivered the same to Pease-Kerr; Pease-Kerr submitted a general liability loss notice form to Rhulen, as agent for Transit, noting the number of the legal liability policy, on April 1, 1985. By this date, Downwyn had already entered an appearance and answered the complaint through its own counsel, attorney John P. Rice.

On April 29, 1985, Rhulen contacted Transit's counsel, Marvin Tepper, regarding the claim. Tepper drafted a non-waiver of rights agreement, which Downwyn executed on May 24, 1985. Rhulen requested, on June 6, 1985, copies of certain depositions, the stud and boarding contracts, foaling records with any related materials, and the status of the case, including settlement positions. On July 9, 1985, Rhulen agreed to pay for the deposition transcripts.

On July 10, 1985, Downwyn's trial counsel, Daniel Sammon, forwarded some items to Rhulen, promised copies of the depositions by July 15, and noted the pending August 12, 1985, trial date and Lichtenstiger's settlement offer of $25,000. Two deposition transcripts were sent to Rhulen on July 12, and a third on July 18, and forwarded to Transit's counsel on July 16 and July 24, 1985. On August 1, 1985, Downwyn personnel located the colt on a farm in Pittsburgh, Pennsylvania. Counsel for Transit determined not to actively enter the limitation on August 5, 1985, and requested that Downwyn's counsel keep him informed.

The case went to trial on August 12, 1985. On the second day of trial, Downwyn entered a statement with the court stipulating liability for failure to deliver the correct foal. Lichtenstiger agreed to accept the colt, $10,000, and attorney fees of $1,500, which Downwyn paid on August 22, 1985. By letter of September 26, 1985, Downwyn's counsel requested payment from Transit for the amount of the settlement ($11,500), investigation expenses ($8,045.53), and attorney fees ($16,165.93), for a total of $35,711.46.

Transit rejected the request on October 8, 1985, asserting that the non-waiver agreement bound the parties, and that Transit was still without sufficient information to determine its position. Downwyn replied on December 11, 1985, restating its position that Transit should cover all costs incurred. On December 19, 1985, Transit's now-former counsel, Marvin Tepper, informed Downwyn that, effective December 3, 1985, the Circuit Court of Cole County, Missouri, had declared Transit Casualty Company insolvent and ordered it into liquidation. Tepper recommended that Downwyn look to the guarantee fund in the State of Ohio for payment on any valid claim

under the policies in question.

On March 5, 1986, a claims examiner acting for the Ohio Insurance Guaranty Association (OIGA) denied Downwyn's claims, finding no coverage under the policy. Downwyn requested reconsideration, which OIGA offered by letter dated October 30, 1986, based upon receipt of additional information. OIGA also recommended that because Attorney Rice's services were rendered prior to Transit's ordered liquidation, OIGA could not consider payment for those services, and that Rice should place his claim therefor with Transit's liquidator in Los Angeles. Downwyn did not respond by letter to this correspondence.

By complaint filed on May 5, 1987, Downwyn started the present action against OIGA, pursuant to R. C. Chapters 3903 and 3955, and prayed for $10,000 as the cost of settlement and $30,000 for attorney fees. OIGA filed its answer on June 3, 1987, essentially denying the complaint and setting forth four defenses. Following a lengthy period of discovery and motion practice, trial was had to the court on April 27, 1989.

By judgment entry dated May 11, 1989, the court found in favor of Downwyn and against OIGA in the amount of $3,085.75, representing the costs of veterinary service for drawing blood on each of the horses involved, the Davis laboratory bills for serology services, and the mating certificate. The court specifically found that "* * * the settlement of $10,000.00, and attorney fees incurred by defending the [underlying] action, * * * are not 'covered claims' within the provisions of O.R.C. Chapter 3955. * * *." Downwyn appeals, asserting two assignments of error.

### ASSIGNMENTS OR ERROR

"1. The trial court erred in finding that the underlying suit against Downwyn was not one arising out of or within the coverage of the legal liability insurance policy held by Downwyn.

"2. The trial court erred in finding that the claim for the costs incurred by Downwyn in defending and settling the underlying suit was not a 'covered claim' as defined in O.R.C. Section 3955.01 (B)."

Because Downwyn's assignments of error are interrelated, they are addressed together. Downwyn argues that the trial court erred by finding that the claims asserted by Lichtenstiger against Downwyn, and

Downwyn's claim for the costs of defending and settling that matter, were not covered by the Transit insurance policies.

Downwyn urges this court to find the language of the policy ambiguous, and construe the policy terms in favor of the farm. As our Supreme Court has recently restated, where provisions of an insurance contract are reasonably susceptible to more than one interpretation, that policy will be construed strictly against the insurer and liberally in favor of the insured. *King* v. *Nationwide Ins. Co.* (1988), 35 Ohio St. 3d 208, syllabus (citations omitted).

The specific section of the "Legal Liability" policy which Downwyn cites states:

"In consideration of the payment of the premium charge, this company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay arising out of the Insured's legal liability for physical loss or injury or damages causing death, or making destruction necessary during the period of this insurance to animals in the care, custody and control of the Insured."
"* * *."

In pretrial motions and in the trial brief, Downwyn argued that the disjunctive phrasing of the above provision indicated that the Transit policy covered "physical loss" as well as "injury" and "damages causing death, or making destruction necessary***." OIGA argued that the disjunctive phrasing instead indicated that "physical loss or injury or damages" must result in either death or necessity of destruction of the animal. The trial court determined that Downwyn's claims were not covered claims.

The policy does not define the term "physical loss." "Common words appearing in a written instrument will be given ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander* v. *Buckeye Pipe Line Co.* (1978), 53 Ohio St. 2d 241, paragraph two of the syllabus. Ballantine's Law Dictionary (3 Ed. 1969), at 755, defines "loss" simply as "[a] deprivation. Damage; also the act of losing and the thing lost." Black's Law Dictionary (5 Ed. 1979), at 1032, defines "physical" as "[m]aterial, substantive, having an objective existence***." Thus, combining these, "physical loss" may be defined as "material deprivation." It is

undisputed that in the underlying case Lichtenstiger was materially deprived, for a period of more than a year, of the colt foaled of Candy D. Travel at Downwyn.

Defining "physical loss" as "material deprivation", and reading the policy language above with this insertion, the policy is ambiguous as to what event actually triggers coverage. If Transit intended to cover only the death or necessity of destruction of horses in Downwyn's care, such could have been clearly stated; instead, death or necessity of destruction is preceded by a disjunctive string of other potential events, including physical loss.

Accordingly, we find that the policy provisions are reasonably susceptible to more than one interpretation. Construing the provisions therein strictly against the insurer, and liberally in favor of Downwyn, we determine that the policy in question in fact provided coverage to Downwyn for misplacement of the Lichtenstiger colt. Downwyn's first error assigned is well taken.

We next must determine whether the trial court erred in determining that Downwyn's settlement with Lichtenstiger for $10,000, and the attorney fees incurred in defending that lawsuit, were not covered claims pursuant to R.C. 3955.

The trial court relied on *Ohio Ins. Guaranty Assn.* v. *Simpson* (1981), 1 Ohio App. 3d 112, for the proposition that attorney fees incurred prior to the declaration of insolvency by an insurer are not covered claims within the meaning of R.C. 3955.01(B). At first blush, *Simpson* would appear to apply to the facts of this case. *Simpson* is limited, however, to those instances where the attorney fees arose from a contract between the insurer and the attorney, and the attorney performed services for the insurer prior to the insurer's insolvency. *Simpson* at 113-14. In the instant case, Downwyn secured the services of an attorney at the time the Lichtenstiger suit was filed. This attorney represented Downwyn throughout the litigation, including dealings with Transit; in addition, Downwyn secured separate trial counsel when trial became inevitable. Transit never retained counsel to work on behalf of Downwyn in the litigation, so Downwyn was saddled with the entire defense. Thus, the holding in *Simpson* does not apply to the instant case, and the trial court's reliance thereon was error.

Next, we consider whether Transit was required to defend Downwyn in the Lichtenstiger litigation under the policy, which we have determined provided coverage for misplacement of the colt.

In the seminal case of *Willoughby Hills* v. *Cincinnati Ins. Co.* (1984), 9 Ohio St. 3d 177, syllabus, our Supreme Court determined that:

> "Where the insurer's duty to defend is not apparent from the pleadings in the action against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim."

This holding has been followed and consistently restated. See *Preferred Risk Ins. Co.* v. *Gill* (1987), 30 Ohio St. 3d 108, 114.

The first and third counts of the Lichtenstiger complaint alleged conversion and breach of contract against Downwyn, and are concededly causes of action not covered by the Transit policies. The second count, however, alleged Downwyn's negligence in failing "to properly supervise, identify and segregate [Lichtenstiger's] colt as a result of which [the] colt was lost or misplaced***." A cause of action alleging negligence is squarely within the Transit policy coverage.

Transit's legal liability policy provided that:

> "* * *.
> "With respect to such insurance as is afforded under this policy, this company shall:
> "1. defend any suit against the Insured alleging such physical loss or injury or damage causing death or making destruction necessary and seeking damages on account thereof, even if such suit is groundless, false or fraudulent, but this company may make such investigation, negotiation and settlement of any claim or suit as they deem expedient."
> "* * *."

Transit therefore agreed to defend Downwyn even when a lawsuit was "groundless, false or fraudulent***." In this case, Transit became aware of the lawsuit as early as April, 1985, but chose not to take an active part in its defense in the days just prior to trial.

In the non-waiver agreement executed

between Transit and Downwyn on May 24, 1985, Transit agreed to investigate the Lichtenstiger matter, but reserved the right to "disclaim coverage based upon late notice of the action to the insurer, the nature of the allegations contained in the action, or otherwise."

Upon review of the trial court's judgment entry, we cannot determine whether the court's decision was premised upon the lack of coverage for the event occurring, or upon the sufficiency of notice provided to Transit by Downwyn. The trial court's entry does not specifically determine whether or not Downwyn timely notified Transit of the Lichtenstiger litigation, although that contention had been previously raised by OIGA in a motion for summary judgment, which the trial court denied.

Accordingly, the judgment of the trial court must be reversed in part, and this cause remanded for the trial court to determine whether Downwyn properly notified Transit of an occurrence pursuant to the notice provision in the insurance policy. If the trial court determines that notice was properly given, it shall proceed to determine the extent to which Downwyn is entitled to attorney fees and settlement costs as a result of the Lichtenstiger litigation. If the trial court determines that notice was not proper, it shall enter judgment accordingly.

The Court finds that there were reasonable grounds for this appeal.

We order that a special mandate issue out of this court, directing the County of Lorain Common Pleas Court to carry this judgment into execution.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E).

CACIOPPO, P. J., Concurs

BAIRD, J., Dissents saying:
Though I agree with the majority's reasoning with respect to the import of the policy language regarding the breadth of the meaning to be attached to the word "loss", as well as with respect to liability for attorney fee expenses incurred by the insured, I do not agree with the reversal and remand.

Since its determination was that this was not a "covered claim" within the meaning of R.C. 3955.01, the trial court did not limit itself to a determination on either of those points, but, rather, it has left open the possibility that its finding was based on any factual finding or legal conclusion yielding a result of no liability for the insurer on this claim. The trial court, in effect, made a general finding, and there was no request for findings of fact and conclusions of law.

In view of the requisite presumption of propriety, a case coming to us in such a posture should be affirmed, unless there is no supportable factual or legal basis upon which the trial court could reasonably have reached such a result.

Since I am not prepared to say that no such basis exists, I would affirm.